(December 31, 1906.)

THE POTLATCH LUMBER COMPANY, a Corporation, Respondent, v. HENRY T. PETERSON et al., Appellants.

[88 Pac. 426.]

EMINENT DOMAIN—ALLEGATIONS OF COMPLAINT—CONSTITUTIONAL LAW—NAVIGABLE STREAMS—IMPROVEMENT OF—FLOATING LOGS AND TIMBER—PRODUCTS—CHARACTER OF NAVIGABILITY—RIGHT TO EXERCISE POWER OF EMINENT DOMAIN—GENERAL WELFARE—PUBLIC USE—OBLIGATION TO THE PUBLIC—RIGHT OF PUBLIC SUPERVISION—OBSTRUCTION OF RIVER PROHIBITED—STREAMS NAVIGABLE IN FACT—DEVELOPMENT OF MATERIAL RESOURCES—PROVISIONS OF CONSTITUTION SELF-EXECUTING—PROCEDURE PROVIDED BY STATUTE.

1. *Held,* that the complaint alleges a cause of action in a suit seeking to exercise the power of eminent domain over land for the improvement of a river for storing water for floating sawlogs and other timber products.

2. Under the provisions of section 14, article 1, of the constitution, the necessary use of lands for the complete development of the material resources of the state is declared to be a public use.

3. Under the provisions of subdivision 3, section 5210, Revised Statutes, the necessary use of lands for storage basins and the improvement of the floatability of such streams may be obtained by the exercise of the power of eminent domain, and the provisions of said subdivision apply to all streams not navigable in fact.

4. The phrase "streams not navigable," as used in said section 5210, Revised Statutes, means streams not navigable in fact.

5. The legislature cannot by legislative act impress the character of navigability on a stream that is not navigable, as a stream not navigable in fact cannot be made so by legislation.

6. The power of eminent domain is an incident of sovereignty inherent in the states of this Union by virtue of their sovereignty.

7. The provisions of section 14, article 1 of the constitution of Idaho, declare for what purposes the power of eminent domain may be exercised, and the legislature cannot prohibit the exercise of that power for any of the purposes therein specified.

8. The right to exercise the power of eminent domain under the constitution of this state is not made to depend upon the narrow and restricted meaning of the phrase "public use" as defined by courts of last resort of some of the states.

9. Under the provisions of said section of the constitution, the general welfare and benefit of the public is taken into consideration, and if the taking is necessary to the complete development of the material resources of the state, such taking is for a public use.

10. The term "public use," as used in said section 14, article 1, of the constitution, means public usefulness and productive of general benefit. That term is a flexible one, and necessarily has been of constant growth as new public uses have developed.

11. The power of eminent domain under our constitution and laws is given a degree of elasticity, thus making it capable of meeting new conditions and improvements of the ever-increasing necessities of society.

12. The person or corporation who exercises the power of eminent domain assumes certain obligations to the public, and the grant of that right carries with it the right of public supervision and reasonable control.

13. One who exercises the right of eminent domain in the improvement of non-navigable rivers in this state for the purpose of floating logs and timber products does not thereby secure the exclusive use and control of such streams, but such streams are open

to the use of anyone who may have occasion to use them for any purpose.

14. Under the provisions of section 835, Revised Statutes, the construction of any dam or boom on any creek or river in this state that will unreasonably delay or hinder the passage or floating of timber down the same is prohibited.

15. In the enactment of section 5210, the legislative intent was to make the provisions thereof applicable to all streams not navigable in fact.

16. Under the provisions of said section of the constitution the power of eminent domain may be exercised when necessary to the complete development of the material resources of the state, and the great lumbering interest of the state is one of the material resources of the state, and cannot be completely developed without the exercise of said power.

17. While said provisions of the constitution are not self-executing, or, in other words, do not furnish the procedure by which that power may be exercised, the procedure to subject lands to a public use has been provided by the legislature.

(Syllabus by the court.)

APPEAL from the District Court of Second Judicial District for Latah County.   Hon. Edgar C. Steele, Judge.

An action to condemn twelve and sixty hundredths acres of land for use as a storage reservoir for logs and timber products and to improve the navigability of the Palouse river.   Judgment for respondent.   *Affirmed.*

Wm. M. Morgan, for Appellants.

The respondent has no greater rights than those provided by the statute under which it seeks to proceed.   The provision of the constitution in question is not self-executing, and if it is broader and more general in its terms than is the statutory enactment, nothing can be drawn from it in aid of the statute.   Whatever rights the respondent may have to appropriate the appellants' land must be found in the act of the legislature.   (Lewis on Eminent Domain, sec. 237; Cooley's Constitutional Limitations, 4th ed., 657; *Long v. Billings,* 7 Wash.

267, 34 Pac. 936; *In re Poughkeepsie Bridge Co.,* 108 N. Y. 483, 15 N. E. 601.)

Nothing is to be read into the statute for the benefit of the respondent which does not appear there. A statute granting to a corporation the power of eminent domain must be strictly construed. (Cooley's Constitutional Limitations, 4th ed., sec. 530; Lewis on Eminent Domain, sec. 254; *Ford Bridge Baptist Cem. Assn. v. Redd,* 33 W. Va. 262, 10 S. E. 405; *Gilmer v. Lime Point,* 19 Cal. 47; *In re Poughkeepsie Bridge Co.,* 108 N. Y. 483, 15 N. E. 601; *United States v. Rauers,* 70 Fed. 748; *Currier v. Marietta etc. R. R. Co.,* 11 Ohio St. 228; *Miami Coal Co. v. Wigton,* 19 Ohio St. 560; *Clay v. Penoyer Creek Imp. Co.,* 34 Mich. 204.)

The taking of property for a strictly private purpose of this kind cannot be justified by merely calling it a public use. (Lewis on Eminent Domain, sec. 165; *Amador Queen M. Co. v. Dewitt,* 73 Cal. 482, 15 Pac. 74; *Con. Channel Co. v. Central Pac. R. Co.,* 51 Cal. 269; *Bridal Veil Lumbering Co. v. Johnson,* 30 Or. 205, 60 Am. St. Rep. 818, 46 Pac. 790, 34 L. R. A. 368; *Apex Trans. Co. v. Garbade,* 32 Or. 582, 52 Pac. 573, 54 Pac. 367, 882, 62 L. R. A. 513; *Healy Lumber Co. v. Morris,* 33 Wash. 490, 99 Am. St. Rep. 964, 74 Pac. 681, 63 L. R. A. 820; *Matthews v. Belfast Mfg. Co.,* 35 Wash. 662, 77 Pac. 1046; *In re Niagara Falls & W. Ry. Co.,* 108 N. Y. 375, 15 N. E. 429; *In re Split Rock Cable-Road Co.,* 128 N. Y. 408, 28 N. E. 506; *Board of Health v. Van Hoesen,* 87 Mich. 533, 49 N. W. 894, 14 L. R. A. 114; *Sholl v. German Coal Co.,* 118 Ill. 427, 59 Am. St. Rep. 379, 10 N. E. 199; *Water Power Co. v. Berrien, Circuit Judge,* 133 Mich. 48, 103 Am. St. Rep. 438, 94 N. W. 379; *Cozard v. Kanawah Hardwood Co.,* 139 N. C. 283, 111 Am. St. Rep. 779, 51 S. E. 932, 1 L. R. A., N. S., 969; *State ex rel. Tacoma Industrial Co. v. White River Power Co.,* 39 Wash. 648, 82 Pac. 150, 2 L. R. A., N. S., 842.)

From the authorities last above cited it will be seen that the true rule is that land cannot be taken under the exercise of the power of eminent domain unless, after it is taken, it will be devoted to the use of the public independent of the will of the corporation taking it.

John P. Gray and G. G. Pickett, for Respondent.

In adopting section 14, article 1, providing for the condemnation of land for public use, the framers of our constitution had in view the decisions of the older states upon the mill dam acts and the Nevada decisions extending the same rule to mines.

The supreme court of Massachusetts, in *Boston & Roxbury Mill Corp. v. Newman,* 12 Pick. 467, 23 Am. Dec. 622, first announced the rule, stating that in regard to the manufacturing establishments, there was nothing in which the public had a more certain and direct interest.    (*Hazen v. Essex County,* 12 Cush. 475; *Murdock v. Stickney,* 8 Cush. 111; *Turner v. Nye,* 154 Mass. 579, 28 N. E. 1048, 14 L. R. A. 487; *Scudder v. Trenton Del. Falls Co.,* 1 N. J. Eq. 694, 23 Am. Dec. 756; *Great Falls Mfg. Co. v. Fernald,* 47 N. H. 444.)

The supreme court of the United States has reached the same conclusion.    (*Head v. Amoskeag Mfg. Co.,* 113 U. S. 9, 28 L. ed. 889, 5 Sup. Ct. Rep. 441; *Otis Co. v. Ludlow Mfg. Co.,* 201 U. S. 140, 50 L. ed. 696, 26 Sup. Ct. Rep. 353.)

California, Nevada, Utah, Colorado, the Dakotas, Montana and Idaho have recognized that the taking of land for the purposes of irrigation, under the climatic conditions which exist in the arid states, is a taking for a public use, and that doctrine has received the support and approval of the supreme court of the United States.    (*Fallbrook Irr. Dist. v. Bradley,* 164 U. S. 112, 41 L. ed. 369, 17 Sup. Ct. Rep. 56.)    Even in the case where the taking is for the benefit of one individual user.    (*Clark v. Nash,* 198 U. S. 361, 49 L. ed. 1085, 25 Sup. Ct. Rep. 676.)

The first case under the Nevada statute allowing the taking of private property under the eminent domain act for the purpose of mining, milling or smelting, or other reduction of ore in the state of Nevada, is the case of *Dayton Gold & Silver M. Co. v. Seawell,* 11 Nev. 394.    (*Overman Silver M. Co. v. Cochran,* 15 Nev. 417; *Douglas v. Byrnes* (C. C.), 59 Fed. 29.)

The principle has been squarely accepted and adopted by

the supreme court of the United States. (*Clark v. Nash,* 198 U. S. 361, 49 L. ed. 1085, 25 Sup. Ct. Rep. 676; *Stikley v. Highland Boy Gold M. Co.,* 200 U. S. 527, 51 L. ed. 581, 26 Sup. Ct. Rep. 301.)

The supreme court of Montana has recognized the doctrine in *Butte etc. Ry. Co. v. Montana Union Ry. Co.,* 16 Mont. 504, 50 Am. St. Rep. 508, 41 Pac. 232, 31 L. R. A. 298, specifically approving *Dayton etc. Min. Co. v. Seawell,* 11 Nev. 394, *Overman etc. Min. Co. v. Cochran,* 15 Nev. 147, *Douglas v. Byrnes,* 59 Fed. 31, and *Hand Gold Min. Co. v. Parker,* 59 Ga. 419, (*Ellenghouse v. Taylor,* 19 Mont. 462, 48 Pac. 757.)

When the constitution of Idaho was framed, the convention undoubtedly had in its mind the decision of all of these states holding that the necessary use of lands for the development of the great natural resources was a public use, and it was with those decisions in mind that they incorporated the provisions of section 14, article 1 of the constitution.

Judge Hanford, in the United States circuit court for Washington, held that the Palouse river was a navigable stream but a month or two during the entire year. During the remainder of the year he held it a non-navigable and a private stream. The case in which this was held was not reported. (*Voltz v. Metcalf Lumber Co.*)

If the stream is not navigable in fact, the mere legislative declaration that it is navigable cannot make it so. (*Murry v. Preston,* 106 Ky. 561, 50 S. W. 1095; *Duluth Lumber Co. v. St. Louis Boom Co.,* 17 Fed. 419; *Watkins v. Doris,* 24 Wash. 636, 64 Pac. 840, 54 L. R. A. 199; *Jones v. Pettibone,* 2 Wis. 308; *Wisconsin River Imp. Co. v. Lyons,* 30 Wis. 61.)

SULLIVAN, J.—This action was commenced for the purpose of condemning twelve and sixty hundredths acres of land belonging to the appellants for use as a storage reservoir for logs, and which is overflowed by reason of the construction of a dam tending to improve the navigability of the Palouse river. The complaint alleges with particularity the necessity for the appropriation and the facts upon which

respondent bases its right to condemn.   The Palouse river is
a small stream having its source in the state of Idaho, and
flows westward into the state of Washington.   At certain sea-
sons of the year its banks are full of water and it becomes
in its natural state a floatable stream for logs.   Except dur-
ing the freshets it is a small stream incapable of serving as
a highway for logs, except by the use of splash dams and other
artificial means.   Along its headwaters are forests of pine
and other timber, a large number of acres of which belong to
respondent.   The stream affords the only means of trans-
porting the timber from the forests to the market.   The re-
spondent owns three mills upon said stream and employs a
large number of men in connection therewith, which mills de-
pend on their supply of sawlogs from such forests, and de-
pend wholly upon said stream for floating said timber down
to the mills.   At the town of Potlatch, Idaho, respondent has
constructed a large sawmill located a short distance down the
stream from the land sought to be condemned, and has built
a dam near said mill on said stream for the purpose of im-
proving the navigation of said stream for logs and affording
a storage reservoir for holding the logs for said mill.

The complaint alleges specifically the facts found by the
court which are hereafter set forth.   The appellants demurred
to the complaint on the ground that it did not state a cause
of action and relied upon two propositions of law in support
of said demurrer: 1. That the taking of said land was not
for a public use; and 2. That the statutes of Idaho were not
sufficiently broad to cover such use.   The demurrer was over-
ruled by the court and appellants refused to further plead,
and stood on their demurrer.   Evidence in support of the al-
legations of the complaint was introduced, and the court made
its findings of fact and conclusions of law and entered  a de-
cree in favor of the respondent.   The court decreed that the
defendants were entitled to receive from the plaintiffs $500 as
full compensation for the damages suffered by them for the
taking of said land for said purposes.   The facts found by
the court necessary to the understanding of this case are as
follows:

After finding that the plaintiff was a corporation duly organized, etc., and that the defendants were husband and wife and in possession of the land sought to be condemned, it found that a large area of land, aggregating hundreds of square miles in the northern portion of Latah county, Idaho, is heavily timbered with a growth of pine and other merchantable and valuable timber; that said territory is drained by the Palouse river and its tributaries and that said lands are adjacent to and lie along the Palouse river and its tributaries; that for many years the said timber area laid undeveloped; that no general business was carried on and no towns or settlements were located in said region; that said county derived practically no taxes from any property situate in said section; that the title to said land was very largely in the government of the United States; that during the past four or five years the plaintiff corporation has become the owner of large tracts of said timber land, and has invested and expended large sums of money in purchasing said timber and timber lands, and is commencing operations to develop the same; that it is the owner of three sawmills on said river, and that the mill at Potlatch in said county was in the course of construction, and employs, and will continue to employ, a large number of men; that said river is a stream used for floating and rafting purposes and the driving of logs and timber products; that it is capable of serving an important public use and utility, and has been declared to be a navigable stream by the legislature of Idaho; that it is navigable for logs only; that it is not navigable for boats of any character or description; that it rises in the state of Idaho and flows for a long distance through the territory described, which is heavily timbered with valuable merchantable timber, and flows into the state of Washington; that said sawmills of plaintiff are situated in what is known as the great Palouse farming country; that there is no merchantable saw timber throughout that farming country, and the forests along said river are the natural supply point from which the said farming country secures its timber and timber products, and the said saw-

mills are furnishing and supplying a large part of the demand for lumber throughout said country, both to citizens of the state of Idaho and the state of Washington; that the only means of transportation of said timber from the forests to the mills at the present time is the said river; that said river is not a wide river, and is not of uniform size during all the seasons, but is subject to the rise and fall dependent on the rain and snow, and, during portions of the year, there is not sufficient water to float the logs in said stream except by the use of artificial means, it being necessary to store the water by the use of dams and splash or flood the logs down, by opening the dams; that it is impossible for plaintiff to transport during the high stages of water, sufficient logs to run its mills during the entire year, although it does take down at such times as many of said logs as is practicable under the circumstances; that during the periods of high water the convenient, economical and practical method of transporting the logs from the forests to the mills is by the use of said splash dams; that said dams cannot be constructed at any place, but necessarily must be built, constructed and maintained at points rendered favorable by the topography of the land on the sides of the river, which affords storage basins for logs, which are very few; that said timber lands owned by the plaintiff are located in that part of the state of Idaho where the working and developing of the timber industry constitutes the principal and main business and occupation of its inhabitants, and that plaintiff in cutting, removing and manufacturing the said timber owned by it, and in the construction of its mill at Potlatch, will employ in said state a large number of men, aggregating many hundreds; that along and adjacent to said river are few farms, and, excepting the lumber industry, the said farming industry constitutes the only industry in which men are engaged in that section of the country; that said farms are situated far from the open market, but the development of the lumber district has and will afford a market at home for the products of the said farms, and the development of the lumber industry is of great im-

portance and benefit to the said farmers residing in that section of the county; that the land upon which said timber now stands is covered with a fertile and productive soil, and upon the removal of the timber will become valuable agricultural land affording homes for thousands of people, and the removal of the timber will result in the development and building up of that section of the farming country described; that the plaintiff has constructed a dam for the purpose of storing the waters of the Palouse river and furnishing a storage basin for logs for the purpose of improving the floating capacity and navigability of said river; that said dam extends across said river; that by reason of the construction of said dam a portion of the land situate in the northeast quarter of the northwest quarter of section 7, township 41 north of range 4 west, Boise meridian, is overflowed by water being backed up by the said dam (then follows a complete description by metes and bounds of said land, containing a total area of twelve and sixty hundredths acres); that seven and seventy hundredths acres thereof is meadow land and four and ninety hundredths acres is brush land; that where said dam is constructed is one of the few places upon said river naturally fitted for the construction and maintenance of the same; that the use of said river by said dam and storage reservoir is the necessary means to a complete development of the material resources of this state, and the use of the said dam and storage reservoir will become and constitutes a public use within the provisions of section 14, article 1, of the constitution of Idaho and the acts of the legislature of the state of Idaho; that the timber of plaintiff cannot be successfully removed and manufactured by any other means than the use of said river except at an enormous, unreasonable and unprofitable expense; that in the manufacture of said timber into lumber at that place it is absolutely necessary that dams for improving the navigation of said stream and storage reservoirs for storing and holding said logs be used, and the necessary use is so great that the timber upon the said areas of land cannot be profitably worked without

the use thereof; that to construct said dam at the point where it is absolutely necessary in the profitable and reasonable use of the stream for the purposes of plaintiff, as aforesaid, it is necessary to overflow the said twelve and sixty hundredths acres of land; that said land is only a portion of a forty acre tract which defendants are in possession of at that point; that there exists a necessity for the appropriation by the said plaintiff of that part of the lands in the possession of defendants to enable the plaintiff to carry on and conduct its business of lumbering and in developing the material resources of said county; that without such appropriation plaintiff cannot profitably, successfully and completely develop its said timber lands, whereas the use of the said lands will enable the plaintiff to profitably and reasonably develop its properties, and thereby develop the material resources of the state; that the denial of the right to use said lands would be disastrous upon the growth and prosperity of the state, and would tend to hinder and retard the development of the material resources of the state; that the plaintiff has been unable to secure the use of said land by agreement or otherwise with the said defendants, though plaintiff did heretofore and before the commencement of this action request and seek to procure from the said defendants said lands for the said storage basin for logs, which request was refused by the defendants and each of them; that plaintiff, when it made such request of the said defendants, offered them a reasonable compensation for the said land for any damages resulting from the grant of said land, and defendants refused to accept said offer for compensation; that the defendants purchased said land with the full knowledge that the plaintiff had already constructed a dam and overflowed said land, and that the plaintiff would need the same in the necessary use of the said river for the purpose of logging and would need the same for the storage of logs; that said land is not more valuable than thousands of acres of other land situated near and adjoining the same and in the vicinity thereof, and the court finds that the award made by the commissioners of $500 is

a just and fair award of all the damages suffered by defendants by reason of the taking of said land for the purposes mentioned; and as conclusions of law from the foregoing facts the court found that the plaintiff was entitled to a decree adjudging and awarding to him the use and easement of said twelve and sixty hundredths acres of land for the purpose of storing logs, floating logs and improving the navigation of said stream, and the right and privilege of overflowing said land. The proper decree was entered in accordance therewith. This appeal is from the judgment, and the only error assigned is the action of the court in overruling the demurrer to the complaint and entering judgment for plaintiff.

It is contended by appellant that the provisions of section 14, article 1 of the state constitution, and the statutes of the state in force in regard to the powers of eminent domain. are not sufficiently broad and comprehensive to authorize or permit the respondent, who is plaintiff here, to have condemned the lands in question for the uses and purposes stated in the complaint. Section 14, article 1 of the Idaho constitution, is as follows:

"Section 14. The necessary use of lands for the construction of reservoirs or storage basins, for the purposes of irrigation, or for rights of way for the construction of canals, ditches, flumes or pipes to convey water to the place of use, for any useful, beneficial or necessary purpose, or for drainage; or for the drainage of mines, or the working thereof by means of roads, railroads, tramways, cuts, tunnels, shafts, hoisting works, dumps, or other necessary means to complete development, or any other use necessary to the complete development of the material resources of the state, or the preservation of the health of its inhabitants, is hereby declared to be a public use, and subject to the regulation and control of the state.

"Private property may be taken for public use, but not until a just compensation, to be ascertained in a manner prescribed by law, shall be paid therefor."

Subdivision 3 of section 5210, Revised Statutes, as amended by the laws of 1903, page 204, is as follows:

"Section 5210. Subject to the provisions of this title, the right of eminent domain may be exercised in behalf of the following public uses: . . . . Subd. 3. Wharves, docks, piers, chutes, booms, ferrier, bridges, toll roads, by-roads, plank and turnpike roads, steam, electric and horse railroads, reservoirs, canals, ditches, flumes, aqueducts and pipes, for public transportation, supplying mines and farming neighborhoods with water, and draining and reclaiming lands, and for storing and floating logs and lumber on streams not navigable."

It is first contended that the complaint does not state a cause of action under said provisions of the constitution and the statute, in that it nowhere alleges that it is proposed to use the land sought to be taken for a reservoir with a view to public transportation. The allegation on that point is to the effect that said river is narrow and not of uniform size during all seasons of the year; is dependent on rain and snow and during portions of the year it does not carry sufficient water to float logs except by the use of artificial means; that it is necessary to store the water by the use of dams and splash or flood the logs down by opening the dams; that during the period of high water, the convenient, economical and practical method of transporting said logs from the forest to the mills is by the use of such dams; that such dams cannot be constructed at all places, but must be built at points rendered favorable by the topography of the land on the sides of the river which affords storage basins for logs; that said dam was constructed for the purpose of storing the waters of said river and furnishing a storage basin for logs for the purposes alleged, and for the purposes of improving the floating capacity and navigability of said river, particularly at the season of the year when said river was at the lowest stage. I think the allegations of the complaint are sufficient to show that the land sought to be taken will be used for the purpose of storing and floating logs and timber on said river and im-

proving its navigability, and under said provisions of the constitution and of subdivision 3, section 5210, Revised Statutes, the right of eminent domain has been extended to land for storing as well as floating logs and timber, and is declared to be a public use.

It is contended that the right of eminent domain under the provisions of said section 5210 can only be exercised in the improvement of streams not navigable, and that as the territorial legislature had declared, by act approved February 14, 1879. that the Palouse river was a navigable stream, the right of eminent domain could not be exercised to improve the navi-gability of said stream. I cannot concur in that contention, as it is clear the provisions of said section 5210 are applicable to all streams not navigable in fact. It is alleged in the complaint and found as a fact by the court that the said stream is not even navigable for logs a part of the season, and I have no doubt that said section applies and was intended to apply to all such streams. Judge Hanford, in the United States circuit court for the state of Washington, in *Voltz & Metcalf v. Potlatch Lumber Co.,* held that said stream was·not a navigable stream except during portions of the year, and that the evidence in that case clearly showed that during a portion of the year logs could be floated upon it; that the period during which they could be floated without the aid of artificial means was comparatively short, constituting only a month or two of the entire year; that during the remainder of the year said stream was not navigable. The decision in that case has not been published in the reports. The court holds that said stream is not navigable in fact, upon the evidence produced on the trial. It is clear to this court that the declaration of a state legislature cannot impress upon a stream a character of navigability for logs when the stream does not carry water sufficient to float a log. If a stream is not navigable in fact, the mere legislature declaration that it is navigable in fact cannot make it so. (*Murray v. Preston,* 106 Ky. 561, 90 Am. St. Rep. 232, 50 S. W. 1095; *Duluth Lumber Co. v. St. Louis Boom Co.,* 17 Fed. 419, 5 McCrary, 382.)

It is alleged in the complaint, and the court found in the case at bar, that said river was not navigable for commercial purposes in its natural state, and it is clear from the allegations of the complaint and findings of the court that it is not navigable for logs or timber products during a great portion of the year unless aided by artificial means and devices. The language used in paragraph 3 of said section 5210, as amended, refers not to streams capable of floating logs, but to streams which are navigable in fact; for it was certainly understood by the legislature that many of the streams of this state which would float logs during flood time did not carry sufficient water to float logs during the remainder of the season, and in order to make them so, the right of eminent domain would need to be exercised for the purpose of procuring land in order to improve the same for storing and floating logs and timber.

Then the question is fairly presented: Does the use of said dam and storage basin of twelve and sixty hundredths acres under the aforesaid facts constitute a public use within the provisions of said sections of our constitution and statutes? The conclusion by this court upon that question is of very great and lasting importance to the complete development of the material resources of our state.

*In limine,* we shall make a few observations upon the power of eminent domain.    That power is an incident of sovereignty inherent in the federal government and the several states by virtue of their sovereignty.    This power with all its incidents is vested in the legislatures of the several states.    (1 Lewis on Eminent Domain, sec. 237; Cooley's Constitutional Limitations, 7th ed., 755; *Hollister v. State,* 9 Idaho, 8, 71 Pac. 541.)

The provisions in regard to the power of eminent domain and the taking of private property for a public use contained in said section 14, article 1 of our constitution, emanate directly from the people instead of from the legislature, and are therefore, legal and valid, emanating from the highest power.    In meeting the marvelous industrial development of many of the United States in the last one hundred years, it

has been found impossible in many instances to follow or apply
the letter of the common law in regard to the power of eminent domain. To follow it in the application of that power
in many instances would greatly hamper, retard, and in many
instances defeat, the development of the great natural advantages, resources and industrial opportunities of many of
the states of the Union. And the framers of our constitution thoroughly understood those facts, and understood that
a complete development of the material resources of our
young state could not be made unless the power of eminent
domain was made broader than it was in many of the constitutions of the several states of the Union. In Idaho, owing
to the contour of the country, its mountain fastnesses and the
great difficulty of preparing and constructing means and
modes of communication and transportation, and also owing
to the arid condition of the state, the necessity for irrigation
in the development of the state's agricultural resources and
in the development of its boundless mineral wealth, it was considered a necessity to the complete development of the material resources of the state to enlarge and broaden the power
of eminent domain in the state; hence the adoption of said
section 14, article 1 of our constitution. In many of the state
constitutions the right to exercise the power of eminent domain is made to depend upon the question whether the use
contemplated is or is not a public use in the most narrow and
restricted meaning of the phrase "public use." The decisions
under many state constitutions, therefore, are of little value
as precedents for cases arising under constitutions like that
of Idaho, Colorado and other western states, which make the
character of the use, whether strictly public or otherwise, the
criterion of the right to exercise the power. There are two
well-marked and conflicting lines of decisions by the ourts
in dealing with the constitutional rights to exercise the power
of eminent domain. One class of those decisions is represented by *Brown v. Gerald*, 100 Mo. 351, 109 Am. St. Rep.
526, 61 Atl. 785, 70 L. R. A. 472, which draws a sharp distinction between "public use" and "public benefit," and

guards the private rights of property against the assertion of the power of eminent domain for public benefits as distinguished from public use. The other line of decisions is represented by *Nash v. Clark*, 27 Utah, 158, 101 Am. St. Rep. 953, 75 Pac. 571, 1 L. R. A., N. S., 208, which case was taken by error to the supreme court of the United States, 198 U. S. 860, 49 L. ed. 1085, 25 Sup. Ct. Rep. 676. That was an action to condemn land for the enlargement of a private ditch, and the supreme court of the United States there held that the peculiar local conditions in the state of Utah justify the enactment of a statute under and by which an individual land owner may condemn as for a public use a right of way across his neighbor's land for the enlargement of a private irrigating ditch in order to obtain water to irrigate his land, which would otherwise remain valueless. The latter class of cases takes the view that the general welfare and benefit of the public should prevail over private property rights, even though the use for which the power of eminent domain is asserted is not in a strict sense a public use, and, as stated in the note to *State ex rel. Tacoma I. Co. v. White River P. Co.*, 31 Wash. 648, 82 Pac. 150, 2 L. R. A., N. S., 842: ''The influence of peculiar local conditions and necessities in determining the choice between these two tendencies is plainly discernible.'' The case of *Talbot v. Hudson*, 16 Gray (82 Mass), 417, belongs to the latter class, and it was held in substance that in determining whether the use is public, it has never been held essential that the entire community, or that any considerable portion of it, should directly enjoy or participate in the benefits to be derived from the purpose for which the property is appropriated. That it is enough if the taking tends to enlarge the resources, increase the industrial energies and promote the productive power of any considerable part of the inhabitants of a section of the state, or leads to the growth of towns and the creation of new channels for the employment of private capital and labor, as such results indirectly contribute to the general prosperity of the whole community.

It is declared in said section of our constitution that the necessary use of lands to the complete development of the material resources of our state is a public use. And I think it clearly appears from the allegations of the complaint and the findings of the court that for the complete development of the vast lumber and timber interests of that section of the state along the Palouse river, the power of eminent domain may be exercised over said twelve and sixty hundredths acres of land. Our attention has not been called to any definition of the term "public use"—that is, a certain criterion to determine when the power of eminent domain may be exercised. In *Olmstead v. Camp,* 33 Conn. 532, 89 Am. Dec. 221, it was contended that the term "public use" should be distinguished from the term "public benefit," and that by "public use" was meant the possession, occupation and direct enjoyment by the public. In determining that question the court said: "It seems that such a limitation on the intention of this important clause would be entirely different from its accepted interpretation and would be as unfortunate as novel. One of the most important meanings of the word 'use' is defined by Webster as 'usefulness,' 'utility,' 'advantage,' 'productive of benefit.' 'Public use' may, therefore, well mean public usefulness, utility, advantage; or what is productive of general benefit; so that an appropriation of private property by the state under its right of eminent domain for purposes of great advantage to the community is a taking for public use. Such, it is believed, is the construction which has uniformly been put upon the language by the courts, legislatures and legal authorities." (See Words and Phrases Judicially Defined, p. 5828.) It is further stated in *Olmstead v. Camp, supra:* "It is a subject (public use) which does not admit the definition, as the defined limits of to-day might not answer for the changed condition of to-morrow. . . . . The power (of eminent domain) acquires a degree of elasticity to be capable of meeting new conditions and improvements of the ever-increasing necessities of society." (See *Dayton Gold & Silver Min. Co. v. Seawell,* 11 Nev. 394.) At page

5829 of volume 6, Words and Phrases Judicially Defined, the author cites a number of decisions under the following propositions: "The term 'public use' is flexible, and cannot be confined to the public use mentioned at the time of forming the constitution. All improvements that may be made, if useful to the public, may be encouraged by the exercise of eminent domain. Any use of anything which will satisfy reasonable public demand for facilities for travel, for transmission of intelligence or of commodities, would be a public use." That term is a flexible one, and necessarily has been of constant growth as new public uses have developed. (Randolph on Eminent Domain, 35.) And it has been said that what is a public use under eminent domain statutes will depend somewhat upon the nature and wants of the community for the time being. (*Brown v. Gerald, supra.*)

There is no doubt when a person or corporation exercises the power of eminent domain, he or it assumes certain obligations to the public, and the grant of the right of eminent domain carries with it the right of public supervision and reasonable control. The improvement of said river is not for the use of the respondent alone, although under the conditions which exist it may be more benefited than others. But the river will be open to anyone who may have occasion to use it for floating logs and timber products. Under the provisions of section 835, Revised Statutes, the construction of any dam or boom on any creek or river in this state that will unreasonably delay or hinder the floating or passage of timber down the same, is prohibited. (*Powell v. Springston Lumber Co., ante,* p. 723, 88 Pac. 97.)

There are many streams in this state that will float logs or lumber during the flood time or spring freshets and will not do so during the time that such streams are at the ordinary stage or during low water. If it be true that all such streams are navigable under the provisions of said section 5210, and for that reason the right of eminent domain cannot be exercised with reference to such streams, the power therein given is a mere shadow, without any substance, and amounts to

nothing. For unless the stream is floatable for logs, there can be no good purpose or reason for storing logs in it or along it. The legislature well knew that many of our streams were floatable for logs in places, and not in others; it had in view those streams in the enactment of section 5210, and it intended to and did grant the right to exercise the power of eminent domain in order to make such streams floatable at places where they were not floatable unless improved by dams or otherwise. Shall we hold that the legislature did the foolish thing of granting the power of eminent domain on streams not floatable for logs and timber, and hold that it has neglected to do so on streams that might with a little improvement be made of great service in the transportation of logs and timber? A reasonable construction should be given to that section of our statute and constitution, and not one which would make the law ineffectual for any purpose whatever. And if, under the provisions of said section 14, article 1 of the constitution, the power of eminent domain may be exercised when "necessary to the complete development of the material resources of the state," and the lumbering interest is one of the material resources of the state, and that resource cannot be completely developed without the exercise of the power of eminent domain, then that power may be lawfully exercised. The legislature cannot annul that provision of the constitution by legislative enactment. The timber interest of our state is one of the great material resources of the state, and it is stated in said section 14 of the constitution as follows: "The necessary use of lands . . . . to the complete development of the material resources of the state . . . . is hereby declared to be a public use." But it is contended by counsel that said provision is not self-executing. We may concede that contention. But the legislature has prescribed the procedure for subjecting land to a public use or for exercising the right of eminent domain. Thus by legislative enactment that provision of the constitution is made effective. The people in this constitution have declared that the necessary use of lands to the complete development of the material re-

sources of the state is a "public use," and the legislature has provided the procedure to subject such lands to that use. The complaint states a cause of action, and the judgment of the trial court must be sustained.    Costs are awarded to the respondent.

Ailshie, J., concurs in the conclusion.

STOCKSLAGER, C. J., Concurring.—I concur in the final conclusion reached but not in all that is said, especially clause 11 of the syllabus.    I think the constitution means "the same in the spring that it does in the fall."